**Linda LEE, Plaintiff,**

**v.**

**BAXTER HEALTHCARE CORP., Defendant.**

**Civ. A. No. R–88–1411.**

United States District Court, D. Maryland.

June 23, 1989.

Charles E. Wilson, Jr., McCarthy, Wilson & Ethridge, Rockville, Md., for plaintiff.

Bruce R. Parker, Goodell, DeVries, Leech & Gray, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

Plaintiff Linda Lee brought this personal injury action against Baxter Healthcare Corporation ("Baxter") and three other named defendants on February 26, 1988. Since that date, plaintiff has filed an amended and a second amended complaint. Plaintiff has voluntarily dismissed defendants Surgitek, Inc., American Hospital Supply, and Mentor Corporation. In her second amended complaint, now pending against Baxter only, plaintiff seeks to recover against defendant for personal injuries allegedly sustained as a result of a ruptured breast prosthesis. Plaintiff seeks to recover on theories of strict liability, negligence, and breach of warranty.

Defendant Baxter has filed a motion for summary judgment in its favor on all of plaintiff's theories of recovery. The motion has been fully briefed, and, finding no need for a hearing, the Court now rules pursuant to Local Rule 6(E) (D.Md.1988). For the reasons stated herein, the Court will grant the motion.

## Background

Between March 1976 and December 1982, Heyer–Schulte Corporation ("Heyer–Schulte"), was a wholly owned subsidiary of American Hospital Supply Corporation. Heyer–Schulte manufactured, among other products, a breast prosthesis. On December 16, 1982, Heyer–Schulte merged with American Hospital Supply Corporation ("American Hospital"), becoming one of American Hospital's divisions. On March 30, 1984, American Hospital sold its breast prosthesis product line to Mentor Corporation. As part of the sale, American Hospital agreed to indemnify Mentor Corporation for any liability arising from a breast prosthesis which had been manufactured and released by Heyer–Schulte.

On November 25, 1985, American Hospital was acquired by Baxter Travenol Laboratories Inc. American Hospital merged into Travenol Laboratories, Inc. on December 31, 1986, which is now known as Baxter Healthcare Corporation. Baxter, the only remaining defendant in this case, is the successor to the indemnity agreement originally made between American Hospital and Mentor.

## Statement of Facts

In late 1975, plaintiff Linda Lee consulted Dr. Bahman Teimourian about breast augmentation. At her deposition, Ms. Lee testified that Dr. Teimourian assured her that there was a "lifetime guarantee" with the breast prosthesis, that the prosthesis could withstand severe impact, and that it would not leak. Plaintiff testified further that Dr. Teimourian did not warn her of the potential complications associated with the procedure, and that had she been warned of the possibility of any complications, she would not have proceeded with the surgery.

Dr. Teimourian testified during his deposition that, although he could not recall the specific conversation he had with Ms. Lee, he would have explained to her all the possible complications with a breast prosthesis known at that time. Additionally, Dr. Teimourian specifically recalled providing all of his patients at that time with a brochure published by Dow Corning Company regarding breast implants which explained the procedure. Ms. Lee does not recall ever receiving that pamphlet or any other warning from the doctor.

After two consultations, Ms. Lee proceeded with the breast augmentation. The surgery was performed at Suburban Hospital in Montgomery County, Maryland on March 3, 1976. Dr. Teimourian has testified that he is not sure which manufacturer's breast prosthesis he implanted in Ms. Lee. However, he does recall that in March 1976, he was using implants manufactured by Heyer–Schulte and Surgitek as well as other companies.

Ms. Lee experienced no problems with the breast implants from March 1976 until November 1985. In November 1985, plaintiff detected small nodules in her left breast. Plaintiff states that she feared she had developed breast cancer since her family has a history of breast cancer, but she did not seek medical assistance until January 1986. At that time, Ms. Lee had a breast examination at a Montgomery County health clinic but was told a diagnosis could not be rendered without an immediate biopsy. Despite this medical recommendation, Ms. Lee chose not to proceed with the biopsy. In August 1986, plaintiff was persuaded to undergo mammography which revealed that her left prosthesis had ruptured.

On September 26, 1986, Dr. Teimourian examined Ms. Lee and confirmed that the left prosthesis had ruptured while the right one remained intact. Dr. Teimourian advised plaintiff that the silicone would not pose a health risk, but nevertheless recommended that both implants be removed and replaced. On October 14, 1986, Ms. Lee underwent explant surgery during which the original implants were replaced by larger implants. Dr. Teimourian last saw plaintiff in May 1987 when she complained of dissatisfaction with the appearance of her new breasts. Dr. Teimourian told Ms. Lee that he could perform corrective surgery, but as of this date the procedure has not been performed.

Plaintiff now seeks to recover damages for the "grievous and painful injuries" caused by the rupture, medical expenses incurred as a result of the rupture, and other "pain and mental anguish" suffered as a result of the rupture. The complaint alleges strict liability, negligence, and breach of warranty as theories of defendant's liability. In its motion for summary judgment, defendant argues that plaintiff cannot make out a cause of action on any of these theories.

### Standards for Summary Judgment

Summary judgment shall be granted only if it appears that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. All evidence shall be viewed in the light most favorable to plaintiff. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). But plaintiff must meet the burden of proof by showing more than the existence of a scintilla of evidence; evidence must be produced sufficient for a reasonable jury to find in plaintiff's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). This standard "mirrors the standard for a directed verdict." *Id.* at 250, 106 S.Ct. at 2511. Plaintiff has the burden of producing evidence that would support a jury verdict, "even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff had a full opportunity to conduct discovery." *Id.* at 257, 106 S.Ct. at 2514. Once the defendant has pointed out the absence of an essential element of plaintiff's case, the burden is on plaintiff to make a sufficient showing to create a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### Discussion

1. Plaintiff Has Failed to Identify the Product Manufacturer

■ Under traditional products liability law, the plaintiff must prove that the defendant manufacturer made the product that caused plaintiff's injury. *See Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480 (11th Cir.1985). It is axiomatic that the plaintiff must prove by a preponderance of evidence at trial that the product which allegedly caused her injury was manufactured and/or distributed by Heyer–Schulte. *Ellis v. International Playtex*, 745 F.2d 292, 296–97 (4th Cir. 1984). In *Celotex v. Catrett, supra*, the Supreme Court upheld the trial court's granting of summary judgment where a plaintiff failed to produce evidence during the discovery process linking the defendant's product with the injury to the plaintiff's deceased husband. Summary judgment was proper because the plaintiff had "failed to produce any evidence that any [Celotex] product ... was the proximate cause of the injuries alleged ..." 477 U.S. at 319, 106 S.Ct. at 2550.

■ Ms. Lee has failed to establish that Heyer–Schulte manufactured and/or distributed the breast prosthesis that allegedly caused her injuries. Plaintiff's complaint states that "defendants do not attach any identifying marks to their breast implant prosthetic devices and it is, therefore, impossible for the patient to identify which defendant is the manufacturer and/or distributor of the product in question." In her response to Baxter's summary judgment motion, plaintiff concedes, "[I]t is possible that the identity of the manufacturer of this breast prosthesis will remain unknown."

Heyer–Schulte did in fact manufacture a breast prosthesis at the time of Ms. Lee's implant. However, Dr. Teimourian testified at his deposition that in March of 1976, he was implanting prostheses produced by a number of manufacturers, including Heyer–Schulte and Surgitek. Ms. Lee's medical records to not identify the manufacturer of the product. Edward Seder, formerly a Director of Quality Assurance at Heyer–Schulte, testified at his deposition that the configuration of Ms. Lee's breast prosthesis was unlike anything he had ever seen produced by Heyer–Schulte. Ms. Lee has produced no evidence linking her prosthesis to Heyer–Schulte. Her only attempt to

identify Heyer–Schulte as the manufacturer has been to name her proposed expert, Ram Kossowsky. Plaintiff states that Mr. Kossowsky will testify as to the identity of the manufacturer, but she has not revealed any such evidence during discovery.

Having conceded that she may be unable to identify the manufacturer of the prosthesis, plaintiff raises several theories of liability based on non-identification of the defendant. Plaintiff focuses on market share liability, but also raises the possibility of alternative liability, concert of action liability, and enterprise liability. Plaintiff raises these theories in her response to defendant's motion for summary judgment; none of the theories is included in the complaint. The only conceivable portion of the complaint raising such a theory is paragraph 5, which asserts that "American Hospital Supply and Baxter Healthcare Corporation and Mentor Corporation, should be held jointly and severally liable." Because only Baxter Healthcare remains in the case, joint and several liability is no longer an available basis of recovery.

■ Even assuming plaintiff had properly pleaded these non-identification theories, she could not prevail on any one of them. None of these theories is recognized under Maryland law.[1] Maryland courts apply traditional products liability law which requires the plaintiff to prove that the defendant manufactured the product which allegedly caused the injury.

Notwithstanding Maryland tort law, Ms. Lee urges the Court to find Baxter liable under the market share liability theory fashioned by the California Supreme Court in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980) *cert. denied* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). In *Sindell,* the

plaintiff alleged that she developed a malignant bladder tumor as a result of her mother's ingestion of DES during pregnancy. Plaintiff recovered against eleven drug companies, although she was unable to identify which manufacturer produced the drug which caused her injury. The court found that the defendants, taken together, provided 90% of the drug to the market during that period, and that they knew or should have known that DES was a carcinogenic substance but failed to warn the public of its potential danger. The burden of showing caustion shifted to the defendants to prove their innocence. Each defendant was unable to prove that it did not produce the DES which caused the harm, and the court held each liable according to its proportion of the market.

■ Even if Maryland did recognize the theory of market share liability, it would be inapplicable to this case. First, the *Sindell* holding only applies in situations where the plaintiff can show that defendants provided a substantial share of the product to the market, and thereby assure the court that it is more probable than not that the defendants before the court are liable for the plaintiff's injury. Dr. Teimourian testified that during the applicable period, he purchased breast prostheses from Heyer–Schulte, Surgitek and possibly others. There is no indication in the testimony that Baxter supplied a substantial share, 75–80%, of the prosthetic devices to Dr. Teimourian, let alone to the market in general. Second, the DES at issue in *Sindell* was an inherently dangerous drug; the manufacturers of DES were ordered by the Food and Drug Administration to stop promoting DES for the purpose of preventing miscarriages and to warn the public that the drug should not be used by pregnant women because of the danger to their unborn chil-

---

1. Because this Court sits in diversity, the Court is bound to follow the choice of law principles of its forum state, Maryland, to determine which state's substantive law governs the action. *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Sokolowski v. Flanzer,* 769 F.2d 975 (4th Cir.1985).

Under Maryland law, the doctrine of *lex loci delecti* is applicable to tort claims. *Rockstroh v. A.H. Robins,* 602 F.Supp. 1259 (D.Md.1985);

*Hauch v. Connor,* 295 Md. 120, 453 A.2d 1207 (1983). Similarly, Maryland adheres to the rule that the law of the place of sale determines the extent and effect of warranties which attend the sale. *Volkswagen of America v. Young,* 272 Md. 201, 321 A.2d 737 (1974). Plaintiff alleges that the injury and sale took place in Maryland. Thus, Maryland law controls plaintiff's claims sounding in tort and warranty.

94

dren. *Sindell,* 163 Cal.Rptr. at 133, 607 P.2d at 925. Nevertheless, defendants continued to market it as a preventer of miscarriages and failed to warn the public of its harmful effects. Breast prostheses are not inherently dangerous products. Additionally, any possible complications were conveyed to the public through warnings inserted in the prosthesis packages.

■ Plaintiff raises three other non-identification theories under which plaintiff need not establish that defendant's product caused the alleged injury. The first of these is the alternative liability theory, embodied in § 433(B) subsection 3 of Restatement (2d) Torts, which states:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each actor to prove that he has not caused the harm.

Alternative liability has not been adopted by any Maryland appellate court. In this case, there is only one defendant before the Court. Comment (g) to this Restatement subsection states that "the rule has no application to cases of alternative liability where there is no proof that the conduct of more than one actor has been tortious at all."

The next possible theory plaintiff raises is the "concert of action" doctrine embodied in § 876 of Restatement (2d) of Torts which states in relevant part:

> For harm resulting to a third party from tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him.

Plaintiff alleged in her opposition motion that Baxter acted pursuant to a common plan of design to commit a tortious act. However, there is no allegation in any of the initial proceedings that Heyer–Schulte acted pursuant to a common plan or design to commit a tortious act. Since plaintiff did not produce evidence to show Baxter had formed a tacit understanding with oth-

er manufacturers of prosthetic devices, plaintiff's allegation is without merit.[2]

A third theory which plaintiff urges the Court to adopt is the concept of "enterprise liability" suggested in *Hall v. E.I. Du Pont de Nemours & Co., Inc.,* 345 F.Supp. 353 (E.D.N.Y.1972). As with the other non-identification theories, this theory has never been adopted by a Maryland court. In *Hall,* the court held that defendants, essentially the entire blasting cap industry, were liable for twelve separate blasting cap incidents. There was evidence that the defendants had adhered to an industry-wide standard concerning the safety features, manufacture, and design of the product, and the standard itself became the cause of the plaintiffs' injuries.

Ms. Lee's attempt to raise the theory of enterprise liability must also fail. Plaintiff has not sued the entire breast prosthesis industry. There is no evidence indicating a sub-par design or manufacturing standard in the industry which caused her injury. Enterprise liability is not applicable to the present case.

In sum, Ms. Lee has failed to establish, as she must under Maryland law, that defendant Baxter manufactured the prosthesis which allegedly caused her injury. Ms. Lee concedes that there is no identifying mark on the prosthesis. The implanting doctor cannot identify the manufacturer. None of Ms. Lee's non-identity theories of liability, assuming they were properly pleaded, is applicable here given both the law in Maryland and the facts of this case.

### 2. Failure to Warn

■ Summary judgment in favor of defendant is also appropriate on plaintiff's claim that defendant failed to warn her of certain risks. Plaintiff advances theories of strict liability and negligence predicated upon Heyer–Schulte's alleged failure to warn her of the risks associated with the breast prosthesis. Under Maryland law, manufacturers of prescription drugs need only warn the prescribing physician and

---

**2.** In *Tidler v. Eli Lilly & Co.,* 851 F.2d 418 (D.C.Cir.1988), the District Court, applying Maryland law, rejected the concert of action theory.

not the patient of risks and contra-indications associated with a prescription drug. *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377 (D.Md.1975). If the prescribing physician has received adequate notice of possible complications, the manufacturer has no duty to warn the consumer. In that instance, the physician is a "learned intermediary" between the manufacturer and the consumer because he is in the best position to understand the patient's needs and assess the risks and benefits of a particular course of treatment.

Medical devices have been analogized to prescription drugs and the learned intermediary doctrine has been applied to devices, requiring the manufacturer to warn only the doctor. In *Phelps v. Sherwood Medical Industries,* 836 F.2d 296 (7th Cir.1987), the court upheld a judgment in favor of the manufacturer of a heart catheter, concluding that the "learned intermediary" exception has "equal application to those cases concerning medical devices." In *Brooks v. Medtronic, Inc.,* 750 F.2d 1227 (4th Cir. 1984), the court applied the learned intermediary doctrine to uphold a judgment in favor of a manufacturer of a cardiac pacemaker. The court reasoned that "physicians are in a better position to assess risks and determine when a particular patient reasonably should be informed about a risk." *Id.* at 1232. As a manufacturer of medical devices, Heyer–Schulte had no duty to warn the plaintiff directly of the risks associated with breast prosthesis. Its only legal duty was to warn Dr. Teimourian.

▮ A warning is legally adequate when it explains the risk which the plaintiff alleges has caused the injury. *Weinberger v. Bristol–Myers Co.,* 652 F.Supp. 187, 191 (D.Md.1986). Plaintiff asserts that Heyer–Schulte failed to warn through its package insert that the breast prosthesis could leak once implanted in the patient. Ms. Lee contends that the "caution" section of the insert was inadequate because it was directed only toward risks that might be encountered by the physician during the implant surgery rather than risks of rupture following the implant. However, the language of the product insert clearly warned of the possibility of leakage once in the body. The second paragraph of the caution reads:

> The gel interior of these products is sufficiently vulcanized to minimize the migration of gel should a rupture occur in the silicone envelope. However, should the silicone envelope be ruptured, Heyer–Schulte cannot guarantee reliable containment and recommends that the prosthesis be replaced.

This caution clearly addresses a risk that could only arise after implantation since the silicone cannot migrate unless it is in the patient's body. Likewise, the recommendation to replace the prosthesis makes sense only as a reference to an implanted prosthesis.

According to the affidavit of Arthur F. Staubitz, Vice President and Deputy General Counsel for Baxter, the product insert containing the warnings was included in all Heyer–Schulte breast prostheses manufactured from May, 1975 through at least March 3, 1976. These warnings address the specific injury that Ms. Lee alleges she suffered—rupture of the prosthesis. Under the rationale in *Weinberger, supra,* Baxter's only duty was to warn Dr. Teimourian of these risks. Consequently, Baxter had no duty to warn Ms. Lee, and her claims for failure to warn must fail as a matter of law.

### 3. Expert Testimony

▮ In order to prove her claims of negligence, strict liability, and breach of warranty, plaintiff must produce evidence that the implants were defective and that the defect was the proximate cause of her injury. *Phipps v. General Motors,* 278 Md. 337, 363 A.2d 955 (1976). The testimony of an expert witness is indispensable in product liability cases "when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman." *Virgil v. "Kash N' Karry" Service Corp.,* 61 Md. App. 23, 31, 484 A.2d 652 (1984). *See also Mesiti v. Pennwalt Corp.,* 574 F.Supp. 1581 (D.Mass.1983) *aff'd* 745 F.2d 43;

*Aarnes v. Merck & Co.*, 532 F.Supp. 148 (D.N.J.1980). In this case, expert testimony is necessary since the cause of the injury claimed is a technical medical question beyond the common knowledge of laypersons.

 The interaction of a breast prosthesis with the human body raises technical questions requiring expert testimony. Ms. Lee has failed to present expert testimony on the defect and causation issues.[3] In the absence of expert testimony, the evidence does not permit an inference that the leak was caused by a defect. The alleged defective implant remained in plaintiff's body for approximately ten years without incident. The rupture could have been caused by numerous alternative factors not attributable to a product defect. It is insufficient to rely merely on the occurrence of the rupture to show a defect. Proof of a defect in a products liability case must rise above speculation and recovery cannot be predicated on a presumption from the mere happening of an accident. *Jensen v. American Motors Corp.*, 50 Md.App. 226, 232, 437 A.2d 242 (1981); *Tauber v. Nissan Motor Corp.*, 671 F.Supp. 1070, 1073 (D.Md.1987). Thus, plaintiff's failure to supply any expert testimony to support her claims of a defect is further grounds for entering summary judgment in favor of Baxter.

### 4. Breach of Warranty

Finally, plaintiff's claim for breach of warranty must fail. In Maryland, a claim for breach of warranty is subject to a four year statute of limitations commencing upon tender of delivery. Comm.Law Maryland Code Ann. § 2–725 (1975). Since plaintiff received the implants on March 3, 1976 her breach of warranty claim was barred as of March 3, 1980. Plaintiff contends that it would be unjust to bar her warranty claims since the breach did not occur until ten years after the implant surgery. However, any injustice resulting from the application of the statute is for the legislature to determine. The warranty claim is time-barred and Baxter is entitled to summary judgment on this claim.

Accordingly, for the reasons set forth herein, it is this 23rd day of June, 1989, by the United States District Court for the District of Maryland,

ORDERED:

1. That defendant Baxter Healthcare's motion for summary judgment is GRANTED.

---

3. Plaintiff admits that expert testimony may be necessary and has obtained Ram Kossowsky to testify as an expert. It is anticipated that he will testify that there was a defective design of the prosthetic device. However, plaintiff has not submitted interrogatory answers or deposition testimony to show the Court that Mr. Kos- sowsky will demonstrate that the prosthesis was improperly designed or manufactured. Plaintiff argues that at this stage in discovery, defendant's summary judgment motion is premature. However, the Court's Scheduling Order set June 2, 1989 as the discovery cutoff date; more than two weeks have passed since that date.